760 So.2d 892 (2000)
James RANDALL, Appellant,
v.
STATE of Florida, Appellee.
No. SC90977.
Supreme Court of Florida.
April 20, 2000.
Rehearing Denied June 9, 2000.
*894 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court finding James Randall guilty of the first-degree murders of Wendy Evans and Cynthia Pugh and imposing death sentences upon him for these murders. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we reverse the first-degree murder convictions and vacate the death sentences because the evidence is insufficient to prove premeditation. We find that the record supports a conviction of second-degree murder in each of these two consolidated cases.

FACTS
Randall was tried in Pinellas County in March 1997 for the strangulation murders of Wendy Evans and Cynthia Pugh. The murder cases were tried together in the same trial after Randall waived his successful motion to sever the two counts. The waiver occurred after the trial judge denied Randall's motion for suppression of evidence of prior incidents involving Randall. The defense moved for a judgment of acquittal as to proof of identity and proof of premeditation, and the trial court denied the motions.
The evidence introduced at trial revealed the following facts. At the time of the murders of Evans and Pugh, who were both known to be prostitutes, Randall lived with Terry Jo Howard on North Belcher Road in Palm Harbor. Howard met Randall when Howard was a prostitute, and she began living with him shortly after he first picked her up on February 28, 1994. The two lived together until Randall's arrest on July 1, 1996.
Evans' body was found the morning of October 20, 1995, and Pugh's body was found the morning of January 18, 1996. Those dates corresponded with the time periods during which Howard was absent for several days from the North Belcher Road residence for the purpose of visiting her mother in West Palm Beach. These were the only time periods while Howard lived with Randall that she was absent from their residence for several days. The bodies of Evans and Pugh were found in separate locations in Pinellas County commercial districts a short distance from Tampa Road. This area was in the same northern area of Pinellas County in which Randall and Howard were living but was north of their residence. Both Evans and Pugh worked as prostitutes in the Fort Harrison area in central downtown Clearwater. Both were white females of similar *895 size and body type, and both died of manual strangulation.
The medical examiner testified that Evans died of asphyxiation through manual strangulation and that she had a bruise on the left side of her head caused by blunt trauma, fingernail abrasion marks on both sides of her neck, a fractured hyoid cartilage above her voice box, three fractured ribs, and a bruise on her inner thigh. The medical examiner testified that Pugh also died of asphyxiation through manual strangulation, which was apparent because of a fracture of the hyoid bone and hemorrhages in her eyeballs. Pugh also had scrapes and bruises on her neck and a laceration on the back of her head.
Both bodies were found nude, with no jewelry, identification, or clothing left at the sites where they were found. Both had cocaine in their bodies at the time of death. No semen was found on either body. A forensic hair and fiber expert testified that one white fur dog hair and a light pink carpet-type fiber were found on the body of Evans. This expert further testified that several distinctive brown and white "banded" dog hairs and one white fur dog hair were found on the body of Pugh, and he testified that all of these dog hairs were consistent with hairs from the dog that lived in Randall's residence. A state crime laboratory analyst testified that he analyzed a pink Nylon fiber, consistent with carpet fibers, that was found on the body of Pugh and found that it was consistent with a pink Nylon fiber on the body of Evans and that both were consistent with Nylon fibers in a rug that was in Randall's residence. A DNA expert testified that a blood sample from Terry Jo Howard was consistent with DNA on a piece of a cigarette butt that was on Pugh's right breast when her body was found. The torn cigarette butt on Pugh's breast also was consistent with cigarette butts that Randall's dog chewed and left on the floor of Randall's residence.
An expert in forensic tire identification was called by the State. Based upon his knowledge of the rarity of a particular tire tread design and size and mold characteristics he found in the tire track at the scene, he testified that it was a "virtual certainty" that tire impressions made at the scene where Evans' body was found matched a defective Firestone ATX tire that was taken from the truck driven by Randall.
Howard and Randall's ex-wife, Linda Randall Graham, testified at the trial as prosecution witnesses. Both women testified that Randall derived sexual stimulation from choking them during sexual activity and that Randall had injured them during the choking. Howard further testified that, during a jail visit after Randall's arrest for the Evans and Pugh murders, she asked Randall, "Why not me?" and he replied by writing in the air with his finger "I hurt others so that I would not hurt you."[1]
The jury returned a verdict of guilty on both counts of first-degree murder and made unanimous recommendations of death for each of the two murders.[2] The *896 trial court agreed with the jury's recommendations and sentenced Randall to death. Randall appeals in this Court, raising five claims.[3]
We find Randall's fourth claim concerning premeditation to be dispositive as to Randall's appeal of his first-degree murder conviction. Our resolution of this issue renders moot Randall's fifth claim, which is a penalty-phase issue. Relevant to the guilt phase of Randall's trial, we also address Randall's first claim as to Williams rule evidence,[4] his second claim as to evidence of flight, and his third claim concerning a comment by the trial judge to prospective jurors.

WILLIAMS RULE EVIDENCE (PRIOR CHOKING INCIDENTS)
We now turn to Randall's claim that the trial court erred in denying his motion to suppress Williams rule evidence, including evidence of prior choking incidents. After reviewing the record, we conclude that this evidence was properly admitted and is relevant to prove the identity of Randall as the murderer of both Evans and Pugh.
Prior to Randall's trial, the prosecution filed a notice of intent to introduce evidence of collateral crimes, wrongs, or acts pursuant to Williams. See § 90.404(2), Fla. Stat. (1995).[5] After an extensive hearing as to this evidence, the trial judge ruled:
Frankly, I've seen lots of Williams Rule arguments, and if there ever was a case that would seem to have an indication, this is it. The purpose of the Williams Rule, of course, you don't need Williams Rule if you have a confession, because identity is easily proved by direct evidence. So I don't generally let Williams Rule evidence in, because I think frankly prejudice outweighs any probative value. But in this case, as I look at the State's cases individually, frankly, if I were assessing the case, they have a very weak circumstantial case, so this is the very type of case where if you have some connection and some similarities in two cases, that the probative value outweighs the prejudice. Because in order to prove that it was indeed Mr. Randall who committed this crime, if they can, they almost have to link these two cases up, it seems to me. So certainly there is probative value if the facts outweigh the prejudice, if there are striking similarities. So now the question becomes, are there striking similarities? Frankly, these two cases are strikingly similar. They happened within a very brief time of each other, in the same county. The bodies were dumped in the same type of areas. Both prostitutes, white prostitutes. They both were manually strangled. They were both nude. They both had no clothes there. They had fibers from the same lot, which showed both bodies had been at the same place. Dog hair, similar, and whatever else. As far as I'm concerned, the similarities here *897 are just outstanding. And therefore, it's a real easy decision. Williams Rule will be allowed as to the Pugh case and the Evans case.
Thereafter, the trial judge addressed the related issue of whether to allow into evidence statements by Linda Randall Graham and Terry Jo Howard as to prior incidents involving Randall. The judge ruled that testimony as to Randall's conviction for the 1986 kidnapping and sexual battery of Graham, his ex-wife, was inadmissible because it was not relevant to the instant crimes. The judge overruled the defense objection as to testimony by Graham and Howard as to choking incidents by Randall during sexual activity. As to this evidence, the judge stated during the hearing:
I'm inclined to let that in; not as Williams Rule evidence, necessarily, but it's inextricably linked, intertwined, really, that there are folks who get sexual gratification from choking others. I don't know that that's a commonly known thing to folks in Pinellas County, that they'd necessarily be aware of that particular gratification. So I think the jurors in the context of this case and in the context of prostitutes being manually strangled have a right to know that Mr. Randall has indicated that this is a method of his gaining sexual gratification.
. . . .
... [T]his case involves prostitutes and it involves naked women, I think therefore it has sexual overtones, sexual connotations. I think the fact that these persons were choked to death maythe fact that this Defendant has admitted he likes to choke women to hurt them, and to receive sexual gratification, therefore it seems to me to have relevance to this case. I'm going to allow it.
In a subsequent written order, the trial judge stated in pertinent part:
ORDERED that since counts one and two of the indictment have been reconsolidated for trial at the request of the Defendant, the State will be permitted to present evidence of the murder of Cynthia Pugh, and the manual strangulation by the Defendant against Terry Howard and Linda Randall (Graham), in the trial for the murder of Wendy Evans, and to present evidence of the murder of Wendy Evans, and the manual strangulation by the Defendant against Terry Howard and Linda Randall (Graham), in the trial for the murder of Cynthia Pugh.
IT IS FURTHER ORDERED that the jury may consider the evidence of the murder of Cynthia Pugh, and the manual strangulation by the Defendant against Terry Howard and Linda Randall (Graham), in the trial involving the murder of Wendy Evans, as it relates to the motive, intent or identification of James Randall, or the absence of mistake or accident on the part of James Randall.
IT IS FURTHER ORDERED that the jury may consider the evidence of the murder of Wendy Evans, and the manual strangulation by the Defendant against Terry Howard and Linda Randall (Graham), in the trial involving the murder of Cynthia Pugh, as it relates to the motive, intent or identification of James Randall, or the absence of mistake or accident on the part of James Randall.
State v. Randall, No. 96-1681-CFANO-S, order at 3-4 (Fla. 6th Cir. Ct. order filed March 14, 1997, nunc pro tunc February 24, 1997).
Over a renewed defense objection, the prosecution presented testimony during the trial describing incidents in which Randall choked both Graham and Howard. Graham testified that during the course of their seven-year marriage, which ended in divorce nine years prior to the murders of Evans and Pugh, Randall would often choke Graham during sexual activity. Graham testified that on July 18, 1986, Randall choked her from behind her back *898 and then on top of her; that Randall derived sexual excitement from this choking, which was against her will; and that she sustained bruises, soreness, and stiffness as a result of the choking. Graham also testified that Randall choked her on September 6, 1986, after tying her hands behind her back with a shoelace, which resulted in marks on her neck and arms.
Howard testified that Randall told her that he became sexually stimulated by choking his sexual partners. She further testified that she acquiesced in the choking "[b]ecause I didn't want him to not get what he needed and then kill me two years down the road." Howard testified that Randall seemed to become more excited if she resisted the choking or showed fear and that he stopped choking her after she stopped reacting. Howard also testified that, in October 1995, she disclosed to Randall shortly after he had heart surgery that a former employer had coerced her to have sex. Howard told the jury that Randall became angry at this disclosure and left the house for a while and that, upon his return, he grabbed her by the throat, threw her against a wall, screamed at her, and choked her until she lost consciousness, and, when she awoke, he was performing sexual acts upon her. Howard testified that the choking caused broken capillaries in her eyes which made her eyeballs red during the eight weeks following this choking incident.
The judge gave this instruction to the jury shortly after Howard began testifying:
The evidence you are about to receive from this witness and the next, concerning allegations of the manual strangulation of either Terry Howard or Linda Randall, will be considered by you for the limited purpose of proving the motive, intent or identity of James Randall, or the absence of mistake or accident on the part of James Randall, in the alleged murder of Wendy Evans or Cynthia Pugh. However, the defendant is not on trial for any crime, wrong or act not charged in the indictment that I have previously read to you.
Randall argues in this Court that evidence of prior choking incidents adduced from the testimony of Graham and Howard was not similar enough to the circumstances surrounding the charged homicides to prove identity and that it was irrelevant to other purposes. Randall contends that the testimony showed only that Randall had a propensity to choke women for sexual excitement and to lash out after a domestic argument but not that he was the murderer of Evans and Pugh.
In Zack v. State, 753 So.2d 9 (Fla.2000), we recently explained:
In Williams v. State, this Court reiterated the standard rule for admission of evidence; that is, that any evidence relevant to prove a material fact at issue is admissible unless precluded by a specific rule of exclusion. See § 90.402, Fla. Stat. (1995). The Court also said relevant evidence will not be excluded merely because it relates to facts that point to the commission of a separate crime, but added the caveat that "the question of the relevancy of this type of evidence should be cautiously scrutinized before it is determined to be admissible." This rule concerning the admissibility of similar fact evidence was codified by the Legislature as section 90.404(2), Florida Statutes (1995).
Later, in Bryan v. State, 533 So.2d 744 (Fla.1988), we made it clear that the admissibility of other crimes evidence is not limited to crimes with similar facts. We stated that similar fact evidence may be admissible pursuant to section 90.404, and other crimes or bad acts that are not similar may be admissible under section 90.402.... Thus, whether the evidence of other bad acts complained of by Zack is termed "similar fact" evidence or "dissimilar fact" evidence, its admissibility is determined by its relevancy. The trial court must utilize a balancing test to determine if the probative effect *899 of this relevant evidence is outweighed by its prejudicial effect.
Id. at 16 (citations omitted).
In accord with our statement in Zack was the trial judge's careful analysis, with which we agree, in this case. The evidence that Randall had previously choked both Graham and Howard during sexual activity was sufficiently similar and relevant to be admitted as evidence of Randall's identification as the perpetrator of the murders of Evans and Pugh, who were choked to death. This evidence, when linked with evidence of the tire track, the dog hair, the DNA, the fact that the victims were both prostitutes and were both nude when found, and the other pieces of evidence, tends to prove that Randall was the perpetrator. Thus, the complained-of choking evidence is clearly relevant as proof of identity and not solely as prohibited proof of bad character or propensity to commit a crime. Moreover, as the trial judge correctly found, the probative value of this evidence was not outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (1995); Williamson v. State, 681 So.2d 688, 696 (Fla.1996). Thus, we find no abuse of discretion in the trial court's ruling that the testimony of Graham and Howard as to prior choking incidents was relevant to identifying Randall and therefore admissible at Randall's trial.

EVIDENCE OF FLIGHT
Randall argues that the State failed to prove that he fled from police to avoid prosecution for the Evans and Pugh murders as opposed to fleeing in order to avoid prosecution on charges concerning a Massachusetts probation violation. Prior to Randall's trial, the court denied a defense motion to exclude flight evidence. At trial, near the beginning of the testimony of Corporal John Quinlan of the Pinellas County Sheriff's Office, defense counsel lodged a continuing objection to Quinlan's testimony as to the statements and actions of Randall prior to and during his flight from a sheriffs officer who was attempting to stop him.
Quinlan testified that, on June 27, 1996, he and a sheriffs detective went to the apartment where Randall lived with Terry Jo Howard. Quinlan knew that Randall was at the time the subject of an outstanding arrest warrant from Massachusetts. However, Quinlan's plan was not to arrest Randall on that warrant. Rather, he planned to arrest Randall later when Randall was in his truck so that he could then perform a warrantless search of the truck incident to the arrest. When Randall appeared at his front door that day, the police detectives asked him whether Howard was at home. She was not. Quinlan told Randall that he was investigating the murders of prostitutes Evans and Pugh. Quinlan asked Randall whether Howard, a known prostitute, had been acquainted with Evans and Pugh, who were also known prostitutes, whether they had been in her residence or her vehicle, and whether Randall himself had ever had any contact with the two murder victims. Randall told Quinlan that Howard was not at home and that he had never seen the victims. Quinlan testified that Randall's hands were visibly shaking as he viewed photographs of Evans and Pugh. Quinlan testified that Randall's outstanding Massachusetts warrant for a probation violation was never mentioned during that conversation.
After the ten-minute interview ended, other sheriff's detectives watched Randall leave the apartment and get into his truck with a man named Maitland Nixon. When the officers in the patrol car attempted to make a traffic stop and arrest Randall on the Massachusetts warrant, Randall led the officers on a high speed chase, eluded capture, and was not apprehended until four days later. Randall's passenger Nixon, who appeared as a State witness, testified that he was the one who first noticed the patrol car and told Randall, "I think we are going to be pulled over." Randall replied, "I'm gonna run. I'm gonna run." *900 When Nixon asked to be let out of the truck, Randall said, "I can't do that, man. I can't do that. I got to go. I got to go. It's my life. I can't stop. They gonna they want me. They're gonna ship me back." He kept repeating "It's my life." Nixon asked him what was going on and appellant replied: "They want me for something up north."
Evidence of flight, concealment, or resistance to lawful arrest after the fact of a crime is admissible as "being relevant to the consciousness of guilt which may be inferred from such circumstances." Escobar v. State, 699 So.2d 988, 995 (Fla.1997) (quoting Straight v. State, 397 So.2d 903, 908 (Fla.1981)). To be admissible, the evidence must indicate a nexus between the flight and the crime for which the defendant is being tried in that case. Escobar, 699 So.2d at 995.
Here, we find a sufficient evidentiary nexus in the record to have permitted the jury to reasonably infer that appellant's flight on June 27, 1996, was related to Randall's consciousness of guilt as to the Evans and Pugh murders as well as to the Massachusetts probation violation. Just before he fled, Randall had been asked by police detectives whether he or his girlfriend had any knowledge of Evans and Pugh and had been shown photographs of these two victims. The Evans and Pugh murders had occurred approximately eight months and five months, respectively, prior to the sheriffs officers' interview with Randall and Randall's subsequent flight; whereas the Massachusetts probation violation occurred in 1992, nearly four years prior to Randall's flight from the Pinellas County Sheriff's patrol car. Moreover, it can be inferred that Randall knew that his being stopped by police would reveal to law enforcement officers the existence of the outstanding Massachusetts warrant for his arrest, which would have led law enforcement officers to the fact that Randall had been convicted in Massachusetts for a sexual battery of his ex-wife, Linda Randall Graham, with accompanying choking behavior.
This case is similar to Freeman v. State, 547 So.2d 125 (Fla.1989), in which this Court concluded that it could be reasonably inferred that Freeman fled to avoid penalties for two separate crimes. Id. at 128. Thus, it is reasonable to infer that Randall fled to avoid prosecution for both the Evans and Pugh murders and the Massachusetts probation violation. Accordingly, we find no error in the trial court's admission of the evidence of Randall's flight, which was relevant to infer consciousness of guilt of the instant murders and the Massachusetts probation violation. The weight to be given the evidence of flight in view of all the circumstances was for the jury to decide.

JUDGE'S COMMENT TO PROSPECTIVE JURORS
Randall argues that the trial judge committed fundamental error by commenting to prospective jurors at the beginning of voir dire as to the existence of State witnesses who probably would not be called to testify. The judge's complained-of statement was as follows:
And, ladies and gentlemen, at this time I'm going to ask one of the Assistant State Attorneys to read you a rather comprehensive list. This is a list of of any person, presumably, who may have any knowledge, no matter how small, about the case.
I will tell you now, as this list is very long, that you will not be hearing from all these people. It will be the State's job to prove their case beyond a reasonable doubt, if they can, and they will call whatever amount of witnesses they feel is appropriate to do that. Whether they have met their burden of proof, of course, is for the jury to decide. They won't parade in five witnesses to repeat what one witness can tell you.

(Emphasis added.) Randall concedes that the defense lodged no contemporaneous *901 objection or request for relief, but contends that fundamental error occurred because the judge's comment to prospective jurors was capable of destroying their ability to decide the case fairly upon the evidence presented in court. In support of his argument, Randall cites cases in which a trial judge's comments have been found on appeal to have constituted fundamental error. Whitfield v. State, 452 So.2d 548, 549 (Fla.1984) (trial judge impermissibly evaluated evidence by instructing jury that defendant's refusal to submit to fingerprinting was circumstance from which consciousness of guilt could be inferred); Hamilton v. State, 109 So.2d 422, 424-25 (Fla. 3d DCA 1959) (trial judge's unintentional remarks before jury were of such character as to indicate court's opinion that defendant was guilty of murder). Randall also cites cases in which courts have found that comments by prosecutors as to uncalled corroborating witnesses were improper and prejudicial and necessitated reversal for a new trial. See Hazelwood v. State, 658 So.2d 1241, 1244 (Fla. 4th DCA 1995); Tillman v. State, 647 So.2d 1015, 1016 (Fla. 4th DCA 1994); Thompson v. State, 318 So.2d 549, 551 (Fla. 4th DCA 1975).
For an error to be so fundamental that it can be raised for the first time on appeal, the error must be basic to the judicial decision under review and equivalent to a denial of due process. See State v. Johnson, 616 So.2d 1, 3 (Fla.1993). In cases in which courts have found judges' or prosecutors' comments to be fundamental error, the improper comments were made in the presence of the jury during the presentation of evidence or arguments. Whitfield; Hamilton; Hazlewood; Tillman. In this case, however, the judge made the complained-of comment prior to voir dire and in the context of describing trial procedure to prospective jurors. See Harmon v. State, 527 So.2d 182, 186-87 (Fla.1988). The record reflects that the judge's comment was a general statement as to the presentation of State witnesses and did not reflect the specific situation as to witnesses in Randall's trial or convey to the jury the impression that in fact the State had a large array of witnesses who could testify against Randall. Our review of the record also demonstrates that subsequently throughout the trial the judge repeatedly instructed the jury to consider only the evidence presented at trial. We find, under the circumstances of this case, that this comment does not constitute fundamental error when considered in context of the entire trial.

PREMEDITATION
In cases in which there is no underlying statutorily enumerated felony, premeditation is the essential element that distinguishes first-degree murder from second-degree murder. See Green v. State, 715 So.2d 940, 943 (Fla.1998). Premeditation is defined as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Wilson v. State, 493 So.2d 1019, 1021 (Fla. 1986). Where the State's proof fails to exclude a reasonable hypothesis that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained. Green, 715 So.2d at 944; Coolen v. State, 696 So.2d 738, 741 (Fla.1997); Kirkland v. State, 684 So.2d 732, 734 (Fla.1996).
Randall contends that the State's evidence did not prove that Randall committed the murders of Evans and Pugh with a premeditated design. He argues in this appeal that the prosecution, by presenting evidence of Randall's history of choking women to heighten sexual arousal, actually demonstrated a reasonable hypothesis that the homicides were other than by premeditated design. See Coolen, 696 So.2d at 741. Randall argues here *902 that the State's circumstantial evidence is consistent with the reasonable hypothesis that Randall began forcefully choking the murder victims during consensual sex and then when they struggled more than his girlfriend or ex-wife would have struggled, Randall became enraged and continued to choke them. This is consistent with the episodes described by both Howard and Randall's former wife. In view of the fact that the other women that Randall choked during sexual activity did not die, it is reasonable to infer that Randall intended for his choking behavior to lead only to sexual gratification, not to the deaths of his sexual partners. Randall contended at trial that, at most, the evidence established second-degree murder under section 782.04(2), Florida Statutes (1995) (second-degree murder is perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life).
We agree in this wholly circumstantial case that the evidence does not support premeditated murder to the exclusion of a reasonable doubt. The evidence does support second-degree murder. Ironically, the testimony by Linda Randall Graham and Terry Jo Howard as to choking during sexual activity, which we have found to be properly admissible as evidence of Randall's identity as the perpetrator of the crimes, is the evidence that makes Randall's argument compelling.
In Kirkland, this Court reversed a first-degree murder conviction, finding that the circumstantial evidence in the strangulation killing of one victim was not inconsistent with any reasonable exculpatory hypothesis as to the existence of premeditation. See 684 So.2d at 734. Although this case involves two murders, unlike Kirkland, we find our reasoning in Kirkland to be controlling here. See id. at 735. As in Kirkland, there was no suggestion here that Randall exhibited, mentioned, or possessed an intent to kill the victims at any time prior to the homicides. Moreover, there was no evidence that either of the two murders was committed according to a preconceived plan.
Therefore, although the pattern of strangulation and the similarities between the murders of Evans and Pugh are sufficient to establish the identity of Randall as the killer of both women, we find that this evidence is insufficient to prove premeditation. Accordingly, we reverse the convictions for first-degree murder and vacate the death sentences.

CONCLUSION
Although we find the evidence in this case is insufficient to support Randall's convictions for first-degree murder, we do find that the evidence is consistent with unlawful killing without any premeditated design to effect the death of any particular individual. § 782.04(2), Fla. Stat. (1995). Accordingly, we reverse Randall's convictions for first-degree murder and vacate his death sentences. In accordance with section 924.34, Florida Statutes (1995), we remand this case to the trial court with instructions to enter a judgment for second-degree murder for the murder of Wendy Evans and a judgment for second-degree murder for the murder of Cynthia Pugh. We direct the trial court to resentence Randall accordingly and to determine whether these two sentences are to be served concurrently or consecutively.
It is so ordered.
HARDING, C.J., and WELLS, LEWIS and QUINCE, JJ., concur.
SHAW and ANSTEAD, JJ., concur in result only.
PARIENTE, J., concurs specially with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., specially concurring.
I concur in the result reached by the majority. However, I write to amplify this Court's statement on page 899 of the majority opinion as to the proper standard to be employed in determining whether evidence *903 of prior bad acts is properly admissible to show identity. When the prior bad acts are being admitted to prove identity, the standard for admissibility is not just whether the prior acts are "sufficiently similar."
Rather, as we explained in Drake v. State, 400 So.2d 1217, 1219 (Fla.1981):
The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations. Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.

(Emphasis supplied.) In a later case, we further recognized that
[t]o minimize the risk of a wrongful conviction, the similar fact evidence must meet a strict standard of relevance. The charged and collateral offenses must be not only strikingly similar, but they must also share some unique characteristic or combination of characteristics which sets them apart from other offenses.
Heuring v. State, 513 So.2d 122, 124 (Fla. 1987) (emphasis supplied). Thus, when similar fact evidence is offered to prove identity, there is a high threshold to meet before the relevancy standard for admissibility can be met.
As Justice McDonald explained: "When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or `fingerprint' type of information, for the evidence to be relevant." State v. Savino, 567 So.2d 892, 894 (Fla.1990). Earlier, in Thompson v. State, 494 So.2d 203, 204 (Fla.1986), we discussed the admissibility requirement under the Williams rule: "To be admissible under the Williams rule, the identifiable points of similarity must pervade the compared factual situations, and, if sufficient factual similarity exists, the facts must have some special character or be so unusual as to point to the defendant." Our recent decision in Zack v. State, 753 So.2d 9 (Fla.2000), did not depart from this well-established precedent; instead, it explained the other uses of similar fact evidence as to issues other than identity.
ANSTEAD, J., concurs.
NOTES
[1] The trial judge allowed this statement by Randall to Howard to be admitted into evidence as a statement against interest.
[2] The trial court found the following aggravators: (1) Randall was on felony probation at the time of the murders (moderate weight); (2) Randall had been previously convicted of another violent felony (1986 kidnapping and rape) (great weight); and (3) the murders were heinous, atrocious, or cruel (HAC) (great weight). The court considered the following as statutory mitigators pursuant to section 921.141(6)(h), Florida Statutes, which was enacted between the time of Randall's offense and his trial, concerning "any other factors in the defendant's background": (1) Randall's sexual sadism as a personality disorder (very little weight); (2) Randall's good work record (some weight); and (3) Randall's family background (not found). As to nonstatutory mitigation, the trial court found: (1) Randall's good jail conduct and courtroom demeanor (some weight); and (2) the possibility of Randall receiving consecutive life sentences for the two murders (not found, in light of the current statutory provision for a sentence of life imprisonment with no possibility of parole).
[3] Randall claims in this appeal that: (1) the trial court erred in allowing the prosecution to introduce evidence of Randall's prior incidents of violence; (2) the trial court erred in allowing the prosecution to introduce evidence of Randall's flight from the police to show his consciousness of guilt; (3) the trial judge committed fundamental error in making an inappropriate comment to the jury venire; (4) circumstantial evidence, while sufficient to prove that the killings were unlawful, was insufficient to prove premeditation; and (5) the trial court erred in instructing the jury that it could weigh as an aggravating circumstance the fact that appellant was on felony probation and in finding this as an aggravating circumstance in her sentencing order.
[4] Williams v. State, 110 So.2d 654 (Fla.1959).
[5] Evidence of other crimes, wrongs, or acts by defendant may be admitted if such evidence is relevant to prove material facts in issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. § 90.404(2), Fla. Stat. (1995).