954 So.2d 1256 (2007)
Luis PEREZ-ORTIZ, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-1383.
District Court of Appeal of Florida, Fifth District.
April 27, 2007.
*1257 Ira W. Still, III, Coral Springs, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellee.
LAWSON, J.
Luis Perez-Ortiz appeals his conviction and life sentence on the charge of first degree (premeditated) murder, for killing his wife. He argues that the trial court erred in denying the motion to suppress his confession, and that the State's evidence at trial was insufficient to create a jury question on the issue of premeditation. We affirm.
Nilda Corsino was last seen by neighbors arriving at her apartment on the evening of March 31, 2004. When she did not show up for work the next day, family members contacted police, who ultimately discovered her dead body lying face-down in an inch of water in a tub inside her apartment. Corsino was fully clothed and had a bruise on her jaw, as well as readily-apparent marks around her neck. An autopsy later confirmed that Corsino died from manual strangulation with a contributing factor of immersion in scalding hot water.
Corsino's body was discovered at around 10:00 p.m. on April 1, 2004. At the time of her death, she had been separated from the Defendant. He was residing with his mother. By the time the investigating officers determined where Defendant was residing, it was early on the morning of April 2. So, at approximately 4:00 a.m., on April 2, detectives Santos and Lee, from the Orange County Sheriff's Office, arrived at the home of Defendant's mother to notify Defendant of the death of his wife. Upon their arrival, Santos and Lee found Defendant dressed in street clothes, with a turtle-neck shirt pulled up on his neck as high as possible. Visible above the shirt's *1258 neckline, however, they could see fresh scratches on Defendant's neck and face. Although the scratches were suspicious, and the detectives considered Defendant to be a suspect, they had no other evidence linking Defendant to Corsino's death, and clearly did not have any basis to detain or arrest him.
Therefore, they asked Defendant if he would voluntarily meet them for questioning. He agreed, and drove himself to the nearby Oviedo police station. Both before and during the video-taped interview, the detectives confirmed to Defendant that he was at the station voluntarily, and could leave if he chose to do so. The interview began in a friendly tone, and the detectives' friendly demeanor never changed. However, the detectives' questions did become accusatory as their interrogation proceeded. Basically, they said or implied that they knew Defendant was involved in Corsino's killing, and used various emotional pleas to secure his confession (repeatedly calling upon him to "do the right thing" in the name of truth, virtue, religion, his upbringing, and for the sake of his son).
Defendant initially denied even being at the apartment when Corsino was killed. Then, he began to sit silently as the detectives speculated about what happened on the night of Corsino's death, and pressured him to confess (again, using only the psychological tool of moral persuasion). Shortly before admitting his guilt, Defendant asked if he could "talk to a lawyer, please?" Immediately, detective Lee told Defendant that this would "end the communication between us," but again told him that: "You're free to go, you don't have to talk to us. You know, you're not under arrest. That is your option." Defendant responded by simply saying: "I didn't do it. We had a bad fight, but I didn't do it." Shortly thereafter, Defendant again asked if he could talk to a lawyer, and Lee once again clearly asked Defendant if he wanted to leave. When Defendant didn't indicate a desire to leave or terminate the interrogation, Lee responded with: "Can I ask you something? What's keeping you from trusting us enough to tell us the truth tonight?" The interview continued, and the Defendant ultimately confessed to killing his wife.

Motion To Suppress Confession
Prior to trial, Defendant filed a motion to suppress his confession, claiming that the detectives violated his Fifth Amendment right to counsel, as outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by failing to discontinue the interview immediately upon his request for a lawyer. In making this argument, Defendant inaccurately represents that the Fifth Amendment requires a law enforcement officer to immediately cease any questioning of a suspect in response to a clear request for an attorney, in any setting. Contrary to Defendant's argument, the Fifth Amendment "right to counsel" is a procedural safeguard created by Miranda to secure the Fifth Amendment's right against compelled self-incrimination during custodial interrogations. Id. at 444, 86 S.Ct. 1602. The Miranda right-to-counsel safeguard simply does not apply outside the context of a custodial interrogation. Id.; Sapp v. State, 690 So.2d 581, 585 (Fla.1997).
We have carefully considered the factors outlined in Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), and agree with the trial court's conclusion that the Defendant was not in custody at any time during the interrogation. Most significantly, the Defendant voluntarily agreed to drive himself to the police station, and was repeatedly told that he was not under arrest and free *1259 to leave at any time.[1] Given the totality of the circumstances, we find that a reasonable person placed in the same position could not have believed that his or her freedom of action was curtailed to a degree associated with actual arrest. Therefore, we conclude that Defendant was never in custody, see Ramirez, 739 So.2d at 573, and that the Miranda safeguards, including the right to counsel, did not apply. Sapp, 690 So.2d at 585.

Sufficiency of Circumstantial Evidence To Prove Premeditation
Defendant also argues that the trial court erred in denying his timely motion for judgment of acquittal as to the charge of first degree murder because the State's evidence was insufficient to prove premeditation. Premeditation is a fully-formed conscious purpose to kill, which exists in the mind for a sufficient length of time to permit reflection. Johnston v. State, 863 So.2d 271, 285 (Fla.2003), cert. denied, 541 U.S. 946, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004). When there is no direct evidence of premeditation, the evidence relied upon by the state to prove premeditation must be inconsistent with any reasonable inference other than that the accused killed his or her victim pursuant to a conscious purpose, formed with sufficient time for reflection. Id.
Because of the time necessary to kill another human by manual strangulation, the circumstance of killing by strangulation alone is deemed sufficient to create a jury question on the issue of premeditation in at least a few jurisdictions. See, e.g., Hounshell v. State, 61 Md.App. 364, 486 A.2d 789, ("Whether the time required to produce death by strangulation is sufficient for the assailant to reflect upon his actions before death ensues is a matter for the jury to determine.") cert. denied, 303 Md. 42, 491 A.2d 1197 (1985); Houck v. State, 563 P.2d 665, 668 (Okla.Crim.App. 1977) (finding the fact that strangulation took several minutes to cause the victim's death sufficient to raise an inference of premeditation); cf. State v. Sturdivan, 497 S.W.2d 139, 142 (Mo.1973) ("Premeditation may be reasonably inferred from the bare hand strangulation of defendant's victim and the subsequent application of the towel for two or three minutes longer to make sure he was dead."); but see State v. Bingham, 105 Wash.2d 820, 719 P.2d 109, 113 (1986) (rejecting rule that strangulation alone is sufficient to create a jury question on premeditation, reasoning that having "the opportunity to deliberate is not evidence the defendant did deliberate, which is necessary for a finding of premeditation").
Although our Supreme Court has not expressly addressed this issue, its rulings in several cases lead to the inescapable conclusion that, in Florida, the length of time necessary to produce death by strangulation, standing alone, is not a sufficient basis to submit the issue of premeditation to a jury. See, e.g., Randall v. State, 760 So.2d 892 (Fla.2000) (finding insufficient evidence of premeditation to uphold conviction for first degree murder in manual strangulation case); Green v. State, 715 So.2d 940 (Fla.1998) (same).
Ms. Corsino, however, did not simply die from strangulation. After being strangled, but while still breathing, she was drowned in an inch of water, in her tub. The only reasonable inference to be drawn from this evidence is that Defendant, after strangling Ms. Corsino, either held her face into the water, or placed her face-down in the water while she was unconscious. Given the time and forethought that would have *1260 been required to prepare the water, or even move the victim into it, after strangling her, we find the evidence sufficient to support a conviction for first degree murder.
AFFIRMED.
TORPY and EVANDER, JJ., concur.
NOTES
[1] When the interview was over, Defendant also drove himself back to his mother's house. The detectives arrested him later in the day, after securing an arrest warrant.