MORRIS, Judge.
 

 Mourad Balzourt appeals his convictions for first-degree murder and abuse of a dead human body. Because the State’s evidence was insufficient to prove premeditation, we conclude that the trial court erred in denying Balzourt’s motion for judgment of acquittal on the charge of first-degree murder. We also conclude that the trial court abused its discretion in
 
 *832
 
 admitting
 
 Williams
 

 [1]
 

 rule evidence. Accordingly, we reverse and remand for a new trial on the charges of second-degree murder and abuse of a dead human body.
 

 Balzourt was convicted of murdering his girlfriend, Solymarie Roman, and setting fire to her body in the woods in Polk County near Poinciana, Florida, in the morning hours of November 1, 2007.
 
 [2]
 
 The cause of death was asphyxiation, and the State’s theory, based on the evidence, was that Balzourt manually strangled the victim. Prior to the trial, the State sought to admit
 
 Williams
 
 rule evidence that in 2000, Balzourt strangled his then-wife to the point of unconsciousness. The trial court allowed the State to introduce such evidence for the purpose of proving that Balz-ourt was the perpetrator of the charged murder.
 

 On appeal, Balzourt contends that the trial court erred in admitting the
 
 Williams
 
 rule evidence because it was not similar enough to the charged homicide to be offered for purposes of proving identity. He claims that the only similarity between the collateral offense and the charged offense is manual strangulation, which is neither unique nor uncommon. Balzourt argues that the collateral evidence was irrelevant and offered only to show his bad character and propensity to choke women.
 

 “[C]ollateral-crime evidence, such as bad acts not included in the charged offenses, is admissible when relevant to prove a
 
 material
 
 fact in issue, but is inadmissible when the evidence is relevant
 
 solely
 
 to prove bad character or propensity.”
 
 Wright v. State,
 
 19 So.3d 277, 291-92 (Fla.2009);
 
 see
 
 § 90.404(2)(a), Fla. Stat. (2007). “ ‘When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, [Florida courts] have required a close similarity of facts, a unique or “fingerprint” type of information, for the evidence to be relevant.’ ”
 
 Kimbrough v. State,
 
 700 So.2d 634, 637 (Fla.1997) (quoting
 
 State v. Savino,
 
 567 So.2d 892, 894 (Fla.1990)).
 

 The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations. Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.
 

 Drake v. State,
 
 400 So.2d 1217, 1219 (Fla.1981). Evidence of a prior act “ ‘is not competent to prove the commission of a particular act charged against him,
 
 unless
 
 connected in such a way as
 
 to indicate a relevancy
 
 beyond mere similarity in certain particulars.’ ”
 
 Williams v. State,
 
 110 So.2d 654, 659 (Fla.1959) (quoting 13 Fla. Jur.
 
 Evidence
 
 § 140).
 

 In this case, we must consider evidence of two incidents of manual strangulation committed by a man against his domestic partner at the time. The
 
 Williams
 
 rule testimony was that Balzourt strangled his ex-wife during an argument. They pushed and hit each other back and forth, and then Balzourt strangled the ex-wife, causing her to lose consciousness. The State’s theory in this murder case was that Balz-ourt choked the victim during an argument over the victim’s ex-boyfriend, William Ju-
 
 *833
 
 sino. But the State presented no evidence regarding the circumstances leading up to and surrounding the actual physical event resulting in the victim’s death. The State was only able to present evidence on the cause of death, i.e., asphyxiation with evidence of manual strangulation and “burk-ing,”
 
 [3]
 
 but not the circumstances leading up to the death. The State presented Jusi-no’s testimony that the victim called him in the middle of the night hours before her body was found. During the phone call, the victim told Jusino that things were over between her and Jusino and Jusino could tell that the victim was with Balzourt because Jusino could hear Balzourt in the background telling the victim what to say and to speak English.
 
 [4]
 
 Jusino testified that he could tell that the victim was sad because her voice was broken, but he did not testify that he heard Balzourt and the victim arguing during the phone call.
 

 As for the circumstances surrounding the victim’s death, the medical examiner agreed that there was evidence indicating that the victim may have been “burked.” In arguing for a judgment of acquittal on premeditation, the defense pointed out that the evidence was not inconsistent with the theory that the perpetrator was sitting on the victim’s chest, strangling her, and hitting her head on the ground. The ex-wife had been standing when she was strangled, but when she regained consciousness, she found herself lying on the floor. The medical examiner testified that it only takes seconds to render a person unconscious by strangulation, whereas it takes approximately two minutes to kill somebody by strangulation and “burking” and three to four minutes to kill somebody by strangulation alone. Because the State did not present evidence of the circumstances leading up to the victim’s death and because the evidence of the physical acts committed against the victim varied from the physical acts committed against the ex-wife, we cannot compare the two incidents to determine whether a domestic dispute and physical incident occurred between Balzourt and the victim similar to the one involving Balzourt and his ex-wife.
 

 One circumstance that cuts against a finding of similarity is the fact that Balz-ourt’s ex-wife did not die as a result of the strangulation, yet the victim in this case died as a result of the strangulation. This distinguishing factor between the
 
 Williams
 
 rule evidence and the charged offense weighed greatly in
 
 Berube v. State,
 
 5 So.3d 734, 741 (Fla. 2d DCA 2009). In
 
 Berube,
 
 the defendant was charged with murder by strangulation, and the State was permitted to introduce evidence that the defendant had physically battered and raped two other women in the past. This court considered “[m]ost important[ ] [the fact that] neither rape victim was murdered,” unlike the murder victim in the charged case.
 
 Id.
 

 The Florida Supreme Court’s case in
 
 Drake
 
 is instructive on both similarity and uniqueness. In
 
 Drake,
 
 the murder victim met the defendant at a bar, left with him, and was later found dead with her hands bound behind her back. The State introduced
 
 Williams
 
 rule evidence that “on two prior occasions[,] [the defendant] had sexually assaulted two different women and had, during the course of those assaults,
 
 *834
 
 bound his victims’ hands behind their backs.” 400 So.2d at 1218.
 

 The
 
 Drake
 
 court concluded that
 

 [t]he only similarity between the two incidents introduced at trial and [the] murder is the tying of the hands behind the victims’ backs and that both had left a bar with the defendant. There are many dissimilarities, not the least of which is that the collateral incidents involved only sexual assaults while the instant case involved murder with little, if any, evidence of sexual abuse.
 

 Id.
 
 at 1219. .In regard to uniqueness or unusualness, the court noted that the “[blinding of the hands occurs in many crimes involving many different criminal defendants. This binding is not sufficiently unusual to point to the defendant in this case, and it is, therefore, irrelevant to prove identity.”
 
 Id.
 
 (footnote omitted).
 

 We cannot conclude in this case that identifiable points of similarity pervade the compared factual situations. Even if we could conclude that the
 
 Williams
 
 rule evidence was similar enough to the charged offense, we cannot conclude that both crimes have a special character or are so unusual as to point to Balzourt. “Collateral crime evidence ... is not relevant and admissible merely because it involves the same type of offense.”
 
 Peek v. State,
 
 488 So.2d 52, 55 (Fla.1986).
 

 The only factor here that might make the compared offenses unique or unusual is that they were committed by Balzourt against his significant other at the time. But as in
 
 Drake,
 
 the dissimilarities between the two offenses in this case are many. Balzourt’s ex-wife was strangled while fighting with Balzourt, but we do not know if this happened with the victim, who was likely strangled but also possibly “burked.” The ex-wife was only rendered unconscious, while the victim was killed. It is not known what the ex-wife and Balz-ourt were arguing about, but it is alleged that Balzourt and the victim were arguing about the victim’s ex-boyfriend. The argument between the ex-wife and Balzourt occurred during the day, but the alleged argument between Balzourt and the victim occurred in the middle of the night. Also, as with the binding of the hands in
 
 Drake,
 
 the strangling or asphyxiation of someone is not so unique or unusual as to point to the defendant because it occurs in many different cases involving criminal defendants in various situations.
 
 See generally Muehleman v. State,
 
 3 So.3d 1149, 1166 (Fla.2009) (defendant convicted of murdering ninety-two-year-old man so defendant could steal from him; defendant attempted to kill the victim by “strangling] [him] for a lengthy period of time”);
 
 Berube,
 
 5 So.3d 734 (defendant manually strangled prostitute with whom he had sexual intercourse);
 
 Randall v. State,
 
 760 So.2d 892 (Fla.2000) (defendant manually strangled prostitutes during sexual activity for purpose of sexual gratification; defendant had also previously strangled women with whom he had romantic relationships);
 
 Perez-Ortiz v. State,
 
 954 So.2d 1256 (Fla. 5th DCA 2007) (defendant charged with strangling his estranged wife);
 
 Dupree v. State,
 
 615 So.2d 713 (Fla. 1st DCA 1993) (defendant strangled a woman with whom he had been socializing the day before her body was found).
 

 Because the
 
 Williams
 
 rule evidence was not sufficiently similar to the charged offense or sufficiently unusual so as to point to Balzourt as the perpetrator of the charged offense, we conclude that the trial court abused its discretion in admitting the
 
 Williams
 
 rule evidence. And because the State’s evidence against Balzourt was totally circumstantial, we cannot say that the error was harmless.
 
 See Williams v. State,
 
 662 So.2d 419, 420 (Fla. 3d DCA 1995) (“Improperly admitting
 
 Williams
 
 
 *835
 
 rule evidence is presumed harmful error”). Accordingly, Balzourt is entitled to a new trial.
 

 Balzourt also argues on appeal that the trial court erred in denying his motion for judgment of acquittal on the murder count because the evidence presented by the State was insufficient to prove that Balzourt was the perpetrator of the crime or that he had the premeditation necessary to sustain a conviction for first-degree murder. We conclude that the State’s evidence was sufficient for the jury to find beyond a reasonable doubt that Balzourt was the perpetrator, but we agree that the State failed to prove the element of premeditation beyond a reasonable doubt.
 

 Premeditation is a fully formed conscious purpose to kill which “ ‘must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.’ ”
 
 Berube,
 
 5 So.3d at 743 (quoting
 
 Coolen v. State,
 
 696 So.2d 738, 741 (Fla.1997)). “Premeditation may be proven by circumstantial evidence.”
 
 Hoefert v. State,
 
 617 So.2d 1046, 1048 (Fla.1993).
 

 However,
 
 “[wjhere the element of premeditation is sought to be established by circumstantial evidence, the evidence relied upon by the state must be inconsistent with every other reasonable in
 
 ference..”
 
 Cochran v. State,
 
 547 So.2d 928, 930 (Fla.1989). Where the State’s proof fails to exclude a reasonable hypothesis that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained.
 
 Hall v. State,
 
 403 So.2d 1319 (Fla.1981).
 

 “ ‘Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.’ ”
 
 Holton v. State,
 
 573 So.2d 284, 289 (Fla.1990), ce
 
 rt. denied,
 
 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991) (quoting
 
 Larry v. State,
 
 104 So.2d 352, 354 (Fla.1958)).
 

 Hoefert,
 
 617 So.2d at 1048 (alteration in original) (emphasis added).
 

 “Florida courts deem evidence of killing by strangulation alone to be insufficient to support a jury finding of premeditation.”
 
 Berube,
 
 5 So.3d at 744. “However, evidence of strangulation, in conjunction with one or more additional facts indicating that the killer had time to reflect upon his actions and to form a conscious purpose to kill, justifies submitting the question of premeditation to the jury for its determination.”
 
 Id.
 
 (citing
 
 Dupree v. State,
 
 615 So.2d 713, 718 n. 1 (Fla. 1st DCA 1993) (noting that “strangulation, in conjunction with other facts, such as evidence of a struggle or other injuries inflicted prior to the strangulation, indicates that the assailant had sufficient time within which to reflect upon his or her actions prior to the strangulation, thereby justifying submission of the question of premeditation to the jury”)).
 

 In
 
 Berube,
 
 this court held that the evidence was sufficient to prove premeditation for two reasons.
 
 Id.
 
 at 744-45. First, the State proved that the victim had five ligature marks on her neck, indicating that the killer had to reposition the cord several times.
 
 Id.
 
 at 744. Thus, the jury could infer that the killer had time to reflect on his actions: ‘We conclude that the repetitive nature of the killer’s actions in repositioning the cord multiple times to begin the strangulation process anew is a factor from which the jury might properly infer premeditation.”
 
 Id.
 
 (citing several cases in which premeditation was proven be
 
 *836
 
 cause strangulation occurred in addition to at least one other act that would take additional time).
 

 Second, the State presented substantial evidence of an intense struggle between the victim and her assailant: she had contusions on her neck, elbow, and thigh, the defendant’s blood was found on the wall, the victim had DNA consistent with the defendant under her fingernails, and the victim had cried for help.
 
 Id.
 
 at 744-45. “[T]he evidence of a struggle occurring shortly before or during the killer’s time-consuming process of suffocating the victim is an additional fact supporting the jury’s finding of premeditation.”
 
 Id.
 
 at 745 (citing several cases in which premeditation was proven because the evidence showed that the victim struggled with her assailant). The court in
 
 Berube
 
 concluded that
 

 the State presented evidence — in addition to the bare fact that the victim was strangled to death — tending to show premeditation. This evidence consisted of (1) the repositioning of the cord around the victim’s neck multiple times and (2) the ample physical evidence indicating that the victim’s strangulation occurred during or immediately after an intense struggle between the killer and the victim. We conclude that this evidence was sufficient for the jury to find beyond a reasonable doubt that the victim’s murder was premeditated.
 

 Id.
 

 In this case, the medical examiner, Dr. Nelson, testified that the victim had “areas of hemorrhage in the hyoid bone, which is the tiny little U-shaped bone that is up into your neck, that your tongue attaches to.” There was “a fracture associated with hemorrhage on both sides.” These injuries were suffered while the victim was alive. Dr. Nelson also testified that the victim suffered a hemorrhage on her tongue, indicating that she bit it while she was still alive. She also had areas of bruising on her head:
 

 Way deep into the back part of her upper neck — this is still her skull. These are the black areas associated with the blows, you see even more here, lower down. So all of these black-blue areas are just that, black-and-blue marks from contusions or bruises from blows to the head. Again, not a postpartum finding. These are — occurred in life, while she’s alive.
 

 Dr. Nelson testified that the victim could have been hit five times on the head:
 

 There’s at least probably two separate areas, and they appear to be paired on both sides of the back of the head and then further down on the right side. So perhaps depending on how you count the paired areas, whether they’re one/two, or this is all one with some type of paired object, it’s either two per side, so two, three, four perhaps, or five, depending on how you count them.
 

 When asked if the victim had defensive wounds, Dr. Nelson testified as follows:
 

 The only thing that she has that is unusual is hemorrhage on the front part of her chest and sternum. She has an area of hemorrhage that measures about 7 by 4 centimeters, so maybe about 3 by 2 inches roughly, a little bit smaller than that, in the center part of her chest underneath her skin, on top of her sternum. But her rib cage and her chest plate, her sternum are intact. She doesn’t have any fractures there, but she does have this area of hemorrhage here, and she also has an area of hemorrhage that’s present on the left side on the undersurface in the very, very top of her chest. Again, no rib fractures, but she’s got bleeding up into the top part of her chest, as well as this area on the — on the sternum.
 

 
 *837
 
 Dr. Nelson testified that the injuries to the hyoid bone and tongue were “very consistent with strangulation.” He also testified that smothering, which could have happened to the victim, would not typically produce the injuries to the hyoid bone. On cross-examination, Dr. Nelson testified that the victim could have been “burked” and that the injuries to her chest were consistent with “burking.” Dr. Nelson agreed that if somebody is “being burked while they’re being manually strangled, [it is possible that] the three or four minutes that it takes to kill somebody could go back to two minutes.”
 

 A forensic anthropologist also testified that the victim had one fracture on her tibia and one fracture on her fibula, both of which occurred prior to the fire and were not a result of the fire.
 

 In sum, the State presented evidence that the victim suffered injuries indicating that she had been more than manually strangled. But the State did not prove that those additional injuries were the result of a struggle or any other act prolonging the strangulation. In arguing for the judgment of acquittal on premeditation, the defense pointed out that the evidence was not inconsistent with the victim’s being strangled while lying on the ground with the perpetrator on top of her chest, hitting her head on the ground. Under this theory, the victim’s death would have occurred in less time than if she had been only manually strangled. After reviewing the evidence, we conclude that the State did not present evidence that was inconsistent with this theory.
 

 We recognize that the State did present evidence that the victim suffered two fractures to her leg. And while this could have been the result of a struggle while the defendant was still alive, the defense’s theory was that these fractures occurred after the victim was killed and when the body was taken to the woods to be placed on fire. The State did not present any evidence that was inconsistent with this hypothesis of innocence; the State only presented evidence that these fractures occurred before the victim’s body was set on fire, not that they occurred while the victim was alive or while she was being killed.
 
 Cf. Berube,
 
 5 So.3d at 745 (“We conclude that the evidence of a struggle occurring shortly before or during the killer’s time-consuming process of suffocating the victim is an additional fact supporting the jury’s finding of premeditation.”).
 

 While the State’s evidence did show that the victim suffered injuries indicative of more than just manual strangulation, the State did not show that these injuries were inflicted in a manner that resulted in a prolonged strangulation or cause of death that would have allowed the killer sufficient time to reflect on his actions.
 
 See Green v. State,
 
 715 So.2d 940 (Fla.1998) (holding that despite evidence that defendant threatened to kill victim, evidence that victim suffered stabbing and blunt trauma wounds along with manual strangulation, which was cause of death, was insufficient to prove that defendant had the requisite premeditation required for first-degree murder);
 
 cf. Perez-Ortiz,
 
 954 So.2d at 1259-60 (“After being strangled, but while still breathing, [the victim] was drowned in an inch of water, in her tub. The only reasonable inference to be drawn from this evidence is that [defendant, after strangling [the victim], either held her face into the water, or placed her face-down in the water while she was unconscious. Given the time and forethought that would have been required to prepare the water, or even move the victim into it, after strangling her, we find the evidence sufficient to support a conviction for first[-]degree murder.”).
 

 On appeal, the State argues only that the victim had aspirated blood in her lungs
 
 *838
 
 and that a jury could infer from this evidence that the strangling was intermittent because she was able to breathe in blood that had been caused by internal injuries to her tongue or airway. While Dr. Nelson testified that the victim breathed blood into her lungs while she was alive, there is no evidence that her being able to take a breath prolonged her death enough to support a finding of premeditation.
 

 In addition, the State did not present any other circumstantial evidence suggesting that Balzourt had a fully formed conscious purpose to kill the victim. Balzourt had not made any earlier statements that he was going to kill the victim, and there were no witnesses to the event.
 
 See Kirkland v. State,
 
 684 So.2d 732, 735 (Fla.1996) (holding that premeditation was not proven and noting that “there was no suggestion that [the defendant] exhibited, mentioned, or even possessed an intent to kill the victim at any time prior to the actual homicide” and that “there were no witnesses to the events immediately preceding the homicide”). The State presented evidence that Balzourt made efforts to conceal and burn the victim's body, but this evidence does not support an inference that he had the specific intent to kill the victim.
 
 See Norton v. State,
 
 709 So.2d 87, 93 (Fla.1997) (“[T]he fact that appellant may have taken steps to conceal evidence of a crime does not establish that he committed murder with a preconceived plan or design. Efforts to conceal evidence of premeditated murder are likely to be as consistent with efforts to avoid prosecution for any unlawful killing.” (citation omitted)).
 

 Based on the above analysis, we conclude that the evidence was insufficient to support the finding of premeditation necessary for the conviction of first-degree murder. We conclude, however, that the evidence was sufficient to support a conviction for second-degree murder.
 
 See Kirkland,
 
 684 So.2d at 735-36 (concluding that there was insufficient evidence to prove premeditation but reversing for entry of second-degree murder conviction);
 
 Berube,
 
 5 So.3d at 743 (“ ‘Premeditation is the essential element which distinguishes first-degree murder from second-degree murder.’ ” (quoting
 
 Coolen,
 
 696 So.2d at 741)). As discussed above, Balzourt is entitled to a new trial based on the
 
 Williams
 
 rule error. On retrial of the murder charge, the State may proceed only on the charge of second-degree murder because Balzourt was entitled to a judgment of acquittal on the charge of first-degree murder and the State is barred by principles of double jeopardy from retrying him for first-degree murder.
 
 See Barton v. State,
 
 704 So.2d 569, 573 (Fla. 1st DCA 1997) (“When an appellate court determines that the evidence presented in a criminal trial is insufficient as a matter of law, the prohibition against double jeopardy prevents retrial .... ” (citing
 
 Burks v. United States,
 
 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978);
 
 McArthur v. Nourse,
 
 369 So.2d 578 (Fla.1979))).
 

 Reversed and remanded for proceedings consistent with this opinion.
 

 SILBERMAN, C.J., and WALLACE, J., Concur.
 

 [1]
 

 .
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [2]
 

 . Balzourt was sentenced to life in prison on the murder count followed by fifteen years on the abuse of a dead body count.
 

 [3]
 

 . The medical examiner, Dr. Stephen Nelson, testified that “burking” is a specific type of killing by asphyxiation. The term came from England in the 1800s, when two men killed people and sold the bodies to a local scientist. The heavier man, named Burke, would sit on the victims’ chests, causing compression to their lungs.
 

 [4]
 

 . Jusino and the victim would speak Spanish to each other, but Balzourt did not speak Spanish.